Harold G. Williams v. Commissioner. Claire Louise Williams v. Commissioner.
Williams v. Commissioner
Docket Nos. 54316, 54317.
United States Tax Court
T.C. Memo 1956-270; 1956 Tax Ct. Memo LEXIS 28; 15 T.C.M. (CCH) 1410; T.C.M. (RIA) 56270; November 30, 1956
*28 Gain realized from the sale of a vessel by a partnership held to be taxable as ordinary income and not as long-term capital gain. Held, further, petitioners' claim that petitioners are taxable, as equal partners, on the husband's share of the profits of a partnership, disallowed. Edward McCarthy, Esq., for the petitioners. Roger L. Davis, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion VAN FOSSAN, Judge: These proceedings involve deficiencies in income tax for 1947 in the amount of $16,794.01 in Docket No. 54316 and $5,045.46 in Docket No. 54317. Increased deficiencies were claimed by the respondent at the hearing. The issues are: (1) Whether the net profits of Marine Industries, a partnership in which petitioner Harold G. Williams *29 had an interest, are taxable as ordinary income or long-term capital gain; (2) whether the profits were understated in the amount of $6,500; and (3) whether petitioner's share of the profits is taxable solely to him or equally to him and his wife as partners. Findings of Fact The stipulation of facts filed by the parties is adopted and, by this reference, made a part hereof. The petitioners are husband and wife and residents of Jacksonville, Florida. They filed separate income tax returns for the taxable year with the then collector of internal revenue for the district of Florida. The husband will be referred to hereinafter as the petitioner. Petitioner's occupation from 1942 to 1948 was executive vice president of the Gulf Atlantic Transportation Company, a corporation hereinafter referred to as Gulf. Gulf was engaged in the transportation of bulk commodities, principally oil, by tugs, barges and small tankers. During 1947 petitioner held less than 5 per cent of the stock of Gulf. About November 1, 1945, petitioner, in response to invitations for bids on four uncompleted vessels located in the yards of the Smith Shipyards, Inc., Pensacola, Florida, submitted a bid of $40,000 *30 for the hull YO-206, accompanied by good faith deposit of $4,000, which was made from his personal funds. His bid was accepted on about November 4, 1945, when he made an additional payment of $4,000 of his own money and requested time within which to pay the balance. Petitioner believed that Gulf would be interested in acquiring the hull from him, but in November 1945 petitioner was informed that it was not interested in acquiring the asset. The action of Gulf relieved petitioner of any obligation to it involving the hull and permitted him to deal in the property in any manner he saw fit. Petitioner had no funds to pay the remainder of the purchase price of the hull. His only sources for funds to finance the purchase were his uncle, D. B. Williams, hereinafter called Williams, who was a member of the Southern Barge Company, a partnership engaged in the transportation of bulk oil by tugs and barges from ports in Texas to Port St. Joe, with offices in New Orleans, and his father-in-law, Jules E. Schaumburg, who was then engaged in the pecan business in New Orleans. Petitioner contacted Williams in November 1945 and Schaumburg in January or February 1946 in regard to participation in *31 the venture with him. In March 1946, prior to the 6th, petitioner, accompanied by his wife, went to New Orleans and while there consulted Schaumburg about investing $10,000 in the purchase of the hull on a partnership basis. Schaumburg had no time to devote to additional business affairs and declined to participate in the venture as a partner with petitioner, or otherwise for profit. Prior thereto petitioner's wife had made frequent requests upon her father for money to pay overdue accounts incurred in extravagant living. Her demands for money irritated him and he desired to get rid of the annoyance. Thereafter, during his visit, Schaumburg offered to lend petitioner $10,000, without interest, toward the purchase of the hull and its conversion for a subsequent sale as a vessel, provided he would give one-half of any profits realized from the sale to his wife so that it would not be necessary for her to request her father to give her money. The offer was accepted by petitioners, and about March 6, 1946, the loan was made to petitioner. The loan agreement was not in writing. Promptly thereafter, Williams agreed to invest up to $10,000 in the venture. On March 6, 1946, petitioner, *32 D. B. Williams and the Southern Barge Company entered into a written agreement of copartnership for the transaction of business under the name of Marine Industries. The purpose of the partnership was stated in the agreement to be "carrying on the business of buying, constructing, completing, equipping, selling, hiring, leasing, chartering and operating ships and vessels of all kinds and character, specifically including tankships, * * *" until March 6, 1948, unless terminated prior thereto by mutual consent. Petitioner agreed to contribute $25,000 to the partnership, Williams $2,500 and the Southern Barge Company $22,500. Profits were to be shared and losses borne in proportion to such contributions of the partners. None of the partners was required by the agreement to devote his or its entire time to the affairs of the business. The intention of the partners when creating the partnership was to confine the activities of the firm to dealings in the YO-206. At the time of acceptance of petitioner's bid for the hull, the Navy Department and Smith Shipyards, Inc., were not in agreement on the question of which was entitled to receive the consideration and which should execute the bill *33 of sale for the property. The sale was subject to the approval of the Navy Department, which was not granted until about March 1946. On March 19, 1946, Smith Shipyards, Inc., acting under the authority and with the approval of the Navy Department, executed an instrument reciting that for the amount of $40,000 paid to it by the partnership, it "does hereby sell, assign and transfer and convey unto Marine Industries, a partnership created and existing under the laws of the State of Louisiana (hereinafter called 'Purchaser'), the following described personal property on an 'as is - where is' basis, to-wit: 'The partially constructed hull YO-206, now afloat at the Shipyard of Smith Shipyards, Inc., at Pensacola, Florida, together with all items of machinery, material and equipment, both contractor (i.e. seller) furnished and government furnished allocable to said hull YO-206 and presently in the custody of seller in accordance with plans and specifications for said vessel prepared by Sparkman and Stephens, Naval Architects'." At the time it acquired title to the hull, the partnership had no definite plans for the sale of the hull or for completing its construction as a vessel. It would *34 have cost about $50,000 to complete the construction of the hull without enlargement of its size. Upon learing that he could not finance the cost of completion of the hull, petitioner became interested in liquidating the partnership venture. During the first half of March 1946, Williams initiated negotiations with the Sinclair Refining Company for the sale of the hull. Sinclair desired a vessel of greater carrying capacity. Further negotiations with Sinclair resulted in an agreement entered into on May 13, 1946, reciting in the preamble that "WHEREAS, it is the desire of First Party [Sinclair Refining Company] to purchase from Second Party [Marine Industries], and the desire of Second Party to sell to First Party, the said YO206 after it shall have been completed as a tankship, as hereinafter set forth, * * *" Terms of the agreement provided: That coincident with the execution of the contract, an agreement was being entered into by the partnership and Sinclair with the Gibbs Corporation for the completion of the hull into a tankship, a copy of which was made a part of the agreement. That Sinclair would pay to the partnership "for said completed tankship" the amount of *35 $365,000, of which $65,000 would be paid with the signing of the agreement and $106,000 upon the delivery of a bill of sale by the partnership to Sinclair "selling and conveying said completed vessel free and clear of all encumbrances * * *." That upon "completion of said tankship, and the acceptance of said completed vessel by" Sinclair, the partnership would document the "vessel" classed to the highest class of a vessel of her tonnage and characteristics with the American Bureau of Shipping and execute in favor of Sinclair a bill of sale and "sell and convey said vessel" to Sinclair "free and clear of all liens and encumbrances whatsoever." That the plans and specifications referred to in the agreement for the completion of the hull by the Gibbs Corporation as a tankship would be furnished by the partnership, and that the partnership was solely responsible for the classification of the "vessel". That if it was necessary to modify the plans and specifications to obtain classification for the vessel, the additional cost thereof would be paid by the partnership. That the partnership would give to Sinclair a surety bond in the amount of $65,000 for the performance by it of its *36 obligations under the agreement and cause the Gibbs Corporation to give bond in the amount of $200,000, as set forth in the construction contract. The contract with Gibbs, reciting as having been executed on April 22, 1946, provided, in part: 1. That for a consideration of $194,000 [1] payable in certain specified installments by Sinclair for the account of the partnership, Gibbs would complete the hull as a tankship in accordance with certain plans and specifications, including the installation of center sections to increase the length of the hull about 46 feet; 2. That if any extras were requested by Sinclair, the cost thereof would be borne by it without liability of the partnership; 3. That Sinclair would promptly inspect all workmanship and material to determine whether they conformed to the contract, but any workmanship or material deemed satisfactory by the governing Classification Society could not be rejected by either Sinclair or the partnership; 4. That Sinclair could change the plans and specifications, any cost thereof to be borne solely by it; 5. That Sinclair would pay to Gibbs $50 for each day the vessel was delivered in advance of the time set forth in the *37 contract for completion and that Gibbs would pay to Sinclair a like amount for each day of delay in making delivery; 6. That Gibbs would make good any defect in material or workmanship provded the partnership or Sinclair gave it notice thereof within 30 days after discovery; 7. That until delivery to it, the partnership would, at its expense, keep the vessel insured against all builder's risks, the policy of insurance to be payable to the partnership, Sinclair and Gibbs as their interests might appear; 8. That Gibbs would furnish a performance bond in the amount of $200,000 in favor of the partnership and Sinclair; 9. That upon notice by Gibbs that the vessel was ready for delivery that the partnership and Sinclair would have the vessel documented in the name of the partnership and then transfer title to Sinclair. The partnership named the vessel F. C. Randall and registered her in that name on November 13, 1946. On the same day, the partnership executed a bill of sale transferring its title to the registered vessel to Sinclair. The certificate of registration and bill of sale recited that the partnership was the sole *38 owner of the vessel. Sinclair paid a total of $171,000 directly to the partnership under the contract of May 13, 1946, and paid a total of $187,500 to Gibbs for the account of the partnership under the contract of April 22, 1946, as amended. Schaumburg did not charge petitioner interest on the loan of $10,000. The debt was paid by petitioner about June 1946. Petitioner's wife never asked petitioner for an accounting or a share of his profits as a member of the partnership, and he never informed her of any amount due her growing out of the venture. Promptly after receiving his first distribution from the partnership in May or June 1946, petitioner purchased a new automobile for his wife, paid some of her bills and opened a bank account for her. Petitioner closed the bank account two or three months after it was opened because of the receipt of statements reporting overdrafts in the account. Petitioners did not file a partnership return for 1947 and they never entered into a written partnership agreement. Marine Industries maintained a bank account. Its books were kept by a part-time bookkeeper. The partnership used the office of the Southern Barge Company, New Orleans, for *39 an address. It did not have its name on the office door or in a telephone or city directory. The only employees of the partnership were a part-time bookkeeper and a watchman or supervisor on the hull while it was being completed by Gibbs as a tankship. The return of the partnership for the fiscal year ended February 28, 1947, reported a profit of $73,848.38, realized from the sale on February 13, 1946, of the hull "converted into Tanker 'F. C. Randall'", taxable as capital gain on an asset held for more than 6 months. The gain was computed on the basis of a selling price of $171,000 and costs totaling $97,151.62. No other income was reported and no deductions were claimed in the return. Of the taxable net long-term capital gain of $36,924.19 reported in the partnership return, one-half thereof, or $18,462.10, was listed as being the share of petitioner. The return of each petitioner for 1947 reported long-term gain of $18,462.10 from the sale by the partnership of a capital asset held for more than 6 months. Of that amount, one-half, or $9,231.05, was reported as gain to be taken into account, but only one-half of that amount, or $4,615.53, was included in taxable income on the *40 ground that the income was earned in a community property state. Advice that the income was earned in a community property state was given to petitioner by counsel, who was not informed by petitioner that his wife had a 50 per cent partnership interest in his interest in the partnership. Respondent held in his determination of the deficiencies that the profit of $73,848.38 realized by the partnership constituted ordinary income and not long-term capital gain, as reported in the partnership return, and pursuant to such determination, he eliminated from petitioner's income the capital gain of $4,615.53 reported in his return and included therein the amount of $36,924.19 as petitioner's distributive share of the ordinary income of the partnership. Respondent, for protective purposes, included one-half of the petitioner's distributive share of the profits of the partnership in the income of the latter's wife and eliminated the capital gain reported by her. Opinion The parties are in agreement upon the amount of gain realized by the partnership in its transactions with Sinclair involving the YO-206 except for the question, raised by respondent in his claim for increased deficiencies, *41 of whether it was understated by $6,500 because of a reduction of that amount in the cost of conversion. Their chief difference is whether the gain so realized was ordinary income or long-term capital gain of the partnership. Capital assets are defined in section 117(a)(1)(A), Internal Revenue Code of 1939, as follows: SEC. 117. CAPITAL GAINS AND LOSSES. "(a) Definitions. - As used in this chapter - "(1) Capital assets. - The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include - "(A) Stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Petitioner contends on brief that the YO-206 purchased by him was a capital asset because (1) it was not his stock in trade, (2) he did not use it in his business, and (3) after Gulf declined to acquire the asset from him, he was compelled to liquidate the property. Statements in his brief are to the effect that the partnership was *42 not engaged in business because provisions of the articles of copartnership gave the partners no power greater than they had as individuals. We are concerned here with what was done, not with what might have been done. Petitioner submitted a bid for the hull on his own behalf, and before acceptance thereof and a bill of sale was executed, the partnership was organized. The partnership took title to the hull, and thereafter it regarded the property as owned by it. Petitioner had, for a period of a few months, rights of a mere bidder but never actually owned or had possession of the property for any purpose in a business of his own. What liquidation occurred was an activity of the partnership, of which petitioner was only one of three members. The issue is confined to the nature of the income of the partnership, an entity for tax-computing purposes, not what would have been the result if petitioner had conducted the transaction in his individual capacity. Sinclair was consulted about acquiring the hull during the first half of March 1946. Whether that was before the partnership was organized on the sixth of that month, does not appear. The date was before the partnership took title *43 to the hull on March 19th and a short time after, if not before, petitioner borrowed $10,000 from Schaumburg to help him finance his participation in the purchase. Petitioner informed his father-in-law at that time that the intention was to sell the hull. The partnership had such power along with other authority, and nothing in the evidence is contrary to the idea that it acquired the property and held it for the primary purpose of sale. If the property was a capital asset, the tax benefit urged by petitioner would result only in the event of a holding period of more than 6 months. Section 117(b) I.R.C. of 1939. On this point petitioner contends that the subject of the sale to Sinclair was the YO-206. He points out that it was acquired by the partnership on March 19, 1946, and argues that it was not sold to Sinclair until November 13, 1946, when the bill of sale was executed; hence, the asset was held for more than 6 months. Such a view eliminates the completed tankship as the subject of the sale. Respondent finds it unnecessary to take a positive stand on the character of the asset sold, because, he asserts, the holding period was less than 6 months whether the partnership sold *44 the YO-206 or a completed tankship. Petitioner testified that the partnership sold the YO-206 for $171,000 on May 13, 1946, and that the conversion of it into a tankship at the agreed price of $194,000 was a transaction solely between the purchaser and Gibbs. Although on brief he refers to the agreement of May 13, 1946, as a "contract of sale," petitioner says that the instrument did not close the sale or end the holding period. Other than the mere citation of two cases, which are clearly distinguishable, he assigns no grounds for his conclusion. Assuming the factual basis of petitioner's contention, no contingencies existed to defer the time for recognition of the sale for tax purposes. We regard the agreement of May 13, 1946, and the conversion contract, which was made a part thereof, as reflecting the intent of the buyer and seller. The preamble of the agreement recites that the desire of the parties thereto was to buy and sell the hull after its completion as a tankship. The contract provided for a selling price of $365,000, which is the total of $171,000, payable directly to the partnership, and $194,000, payable by Sinclair to Gibbs for the account of the partnership as a *45 credit on the purchase price; that the partnership was to furnish the plans and specifications for the conversion and obtain a classification certificate upon completion, each at its expense; that the partnership would give bond in the amount of $65,000, an amount equal to the down payment on the purchase price, for the faithful performance by the partnership and Gibbs of their contracts, and cause Gibbs to give bond in the amount of $200,000 for the performance of the conversion contract; and that the partnership would keep the property insured, at its expense, against builder's risks. It thus appears that the agreement of May 13, 1946, construed in the light of the contract to convert, was a contract to sell a tankship and until its completion and classification, there was no definite obligation on the part of Sinclair to buy and pay the purchase price. The decisive event did not occur until a date less than 6 months prior to November 13, 1946, when a bill of sale conveying title was executed. Accordingly, in this issue we hold for the respondent. The gist of respondent's contention under the issue on the amount of gain realized from the sale is that the reduction of $6,500 *46 in the agreed amount for converting the hull into a tankship did not result in a corresponding reduction in the sales price of the vessel. The recited selling price of $365,000 for the asset, as already pointed out, was the sum of the payments aggregating $171,000 to be made by Sinclair directly to the partnership and $194,000 to be paid by Sinclair to Gibbs for the account of petitioner for construction costs. The contract with Gibbs for the conversion of the hull was made a part of the contract to sell and they must be construed together for the intent of the parties. So construed, it is apparent that the parties intended that the selling price was to be no more than $171,000, payable directly to the partnership, plus the costs chargeable to the partnership for conversion, and payable by Sinclair to Gibbs for the account of the partnership. Accordingly, the reduction of $6,500 in the cost to the partnership for converting the hull reduced the selling price by a corresponding amount without increasing the amount of gain. On this issue we hold for the petitioners. The petitioners' distributive share of the profits of the partnership was reported by petitioners as community income *47 on advice of counsel. The refusal of respondent so to recognize it was not assigned as error and on brief petitioners concede that there was no merit in the community property question. Instead, petitioners alleged that they were partners or joint adventurers in his interest in the partnership and, as such, each is taxable on only one-half of the amount of his share of the profits of Marine Industries. This is now their only contention on this issue. No contention is made by the petitioners that the wife contributed services to the alleged joint enterprise between them. No written agreement was entered for that purpose and it is not expressly asserted that a verbal understanding was had in the matter. There is no evidence of any agreement to share losses. No accounting was made by petitioner to his wife for profits and she never requested him to make one. We find no evidence from which it could be found that she ever manifested any interest in the amount of money he would likely make or had made as a member of Marine Industries. The gist of petitioners' contention on brief is that the wife contributed $10,000 loaned by her father and that the agreement of the husband with Schaumburg *48 to share any profits with her created the joint enterprise between them. The evidence establishes beyond doubt that the loan was made by Schaumburg to the husband, without any liability of the wife for repayment, for investment in Marine Industries. The husband agreed to share any profits equally with his wife and she agreed, as a condition to the loan, to refrain from making further requests on the lender for money to pay accounts incurred in extravagant living. Clearly, no money was contributed by the wife and her acquiescence in the arrangement between her husband and father was essentially a personal family affair designed to rid Schaumburg of annoying demands upon him by his married daughter for money. We find nothing in the arrangement, or any other evidence, from which to conclude that petitioners "in good faith and acting with a business purpose intended to join together in the present conduct of * * *" enterprise. Commissioner v. Culbertson, 337 U.S. 733; Burnet v. Leininger, 285 U.S. 136; Lucas v. Earl, 281 U.S. 111. On this issue we hold for the respondent. Decisions will be entered under Rule 50. Footnotes
1. Amount reduced on May 28, 1946, to $187,500.↩